# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID KARLING, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:22-cv-00295 |
| v. | ) ) | Hon. Sara L. Ellis |
| SAMSARA INC., a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) | |

**DEFENDANT SAMSARA INC.'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................... ii

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 6

I.     Plaintiff's Claims Against Samsara Are Preempted By Federal Law. .............................. 7

II.    Plaintiff's Claims Violate the Dormant Commerce Clause. ............................................ 10

III.    Plaintiff Fails to Plausibly Allege a BIPA Claim Against Samsara ................................. 12

     A.     Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(a) of BIPA. ......................................................................................... 13

     B.     Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(b) Of BIPA. ......................................................................................... 13

     C.     Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(c) of BIPA. ......................................................................................... 15

     D.     Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(d) of BIPA. ......................................................................................... 17

     E.     Plaintiff Fails To Plausibly Allege That Samsara Intentionally Or Recklessly Violated BIPA. ........................................................... 18

CONCLUSION ..................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*188 LLC v. Trinity Industries, Inc.*,
   300 F.3d 730 (7th Cir. 2002) ...................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................13

*Aux Sable Liquid Products v. Murphy*,
   526 F.3d 1028 (7th Cir 2008) ...........................................................7, 8

*Baker v. Northwestern Medicine Lake Forest Hospital*,
   No. 16-CV-05669, 2017 WL 2908766 (N.D. Ill. July 7, 2017)............13

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................13

*Bernal v. ADP, LLC*,
   2019 WL 5028609 (Ill. Cir. Ct. Aug. 23, 2019) ....................14, 15, 16, 17

*Bibb v. Navajo Freight Lines, Inc.*,
   359 U.S. 520 (1959)......................................................................11, 12

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
   476 U.S. 573 (1986)...........................................................................11

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)......................................................................7, 10

*Felder v. Casey*,
   487 U.S. 131 (1988)............................................................................7

*Geier v. American Honda Motor Co.*,
   529 U.S. 861 (2000)...................................................................7, 9, 10

*Healy v. Beer Institute*,
   491 U.S. 324 (1989)...........................................................................11

*Henson v. CSC Credit Servs.*,
   29 F.3d 280 (7th Cir. 1994) ................................................................2

*Hughes v. United Van Lines, Inc.*,
   829 F.2d 1407 (7th Cir. 1987) ............................................................8

*Kassel v. Consolidated Freightways Corp.*,
    450 U.S. 662 (1981)................................................................................11, 12

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017) ............................................................11, 12

*Leroy Jacobs v. Hanwha Techwin America, Inc.*,
    No. 21 C 866, 2021 WL 3172967 (N.D. Ill. July 27, 2021) ..............16, 18

*Midwest Title Loans, Inc. v. Mills*,
    593 F.3d 660 (7th Cir. 2010) ............................................................11, 12

*Morgan v. Virginia*,
    328 U.S. 373 (1946).................................................................................8

*Morley-Murphy Co. v. Zenith Elecs. Corp.*,
    142 F.3d 373 (7th Cir. 1998) ..................................................................11

*Namuwonge v. Kronos, Inc.*,
    418 F. Supp. 3d 279 (N.D. Ill. 2019) ..........................................14, 16, 18

*Owner-Operator Ind. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*,
    494 F.3d 188 (D.C. Cir. 2007).................................................................4

*Owner-Operator Ind. Drivers Ass'n v. U.S. Dep't of Transp.*,
    840 F.3d 879 (7th Cir. 2016) .................................................................10

*Papasan v. Allain*,
    478 U.S. 265 (1986).................................................................................2

*Peatry v. Bimbo Bakeries USA, Inc.*,
    No. No. 19 C 2942, 2020 WL 919202 (N.D. Ill. Feb. 26, 2020)............19

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...............................................................................11

*Pooh-Bah Enterprises, Inc. v. County of Cook*,
    232 Ill. 2d 463 (2009) .....................................................................15, 16

*Rogers v. CSX Intermodal Terminals, Inc.*,
    409 F. Supp. 3d 612 (N.D. Ill. 2019) .....................................................18

*Vance v. Microsoft Corp.*,
    Case No. C20-1082JLR, 2021 WL 1401634 (W.D. Wash. April 14, 2021) ..........................17

*Venture Assoc. Corp. v. Zenith Data Systems Corp.*,
    987 F.2d 429 (7th Cir. 1993) ...................................................................6

**Statutes, Regulations, and Agency Documents**

Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* .................................................. *passim*

49 U.S.C. § 31137(a)(1) ........................................................................................................... 5

49 U.S.C. §§ 31137(a)(2), 31137(d)(2) .............................................................................. 9-10

49 U.S.C. § 31308(3) ................................................................................................................ 9

Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, 100 Stat.
3207 .................................................................................................................................... 3

Department of Transportation Act of 1966, Pub. L. No. 89-670, 80 Stat. 931 ............................... 3

Fixing America's Surface Transportation Act, Pub. L. No. 114-94, 129 Stat. 1312
(2015) .................................................................................................................................. 3

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) .............. 4, 10

Motor Carrier Act of 1935, Pub. L. No. 74-255, 49 Stat. 543 ............................................ 3, 4

Motor Carrier Safety Act of 1984, Pub. L. 98–554, Title II, 98 Stat. 2832 .............................. 4

Motor Carrier Safety Act of 1990, Pub. L. No. 101-500, 104 Stat. 1218 ................................. 3

Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113
Stat.1748 ............................................................................................................................ 3

Moving Ahead for Progress in the 21st Century Act, Pub. L. 112-141, 126 Stat.
405 (2012) .......................................................................................................................... 3

National Driver Register Act of 1982, Pub. L. No. 97-364, 96 Stat. 1738 ............................... 3

Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. 2097 ............. 3, 8

Tandem Truck Safety Act and Motor Carrier Safety Act of 1984, Pub. L. No. 98-
554, 98 Stat. 2829 .............................................................................................................. 3

Truck and Bus Safety and Regulatory Reform Act of 1988, Pub. L. No. 100-690,
102 Stat. 4181 ................................................................................................................ 3, 4

49 C.F.R. part 395 .................................................................................................................... 4

49 C.F.R. § 395.16 .................................................................................................................... 4

49 C.F.R. § 395.16(j) ................................................................................................................ 4

49 C.F.R. § 395.22(e) ................................................................................................................ 5

49 C.F.R. § 1572.17(c) ................................................................................................9

65 Fed. Reg. 25,562 (May 2, 2000) ............................................................................4

80 Fed. Reg. 78,292 (Dec. 16, 2015) ...................................................................5, 10

*Census of Fatal Occupational Injuries Summary, 2020*, U.S. Bureau Lab. Stat.
(Dec. 16, 2020) ......................................................................................................2

*Large Truck and Bus Crash Facts 2018*, U.S. Dep't of Transp., Fed. Motor
Carrier Safety Admin. (Oct. 2, 2020) ...................................................................2

*National Roadway Safety Strategy*, U.S. Dep't of Transp. (Jan. 2022) .................3, 9

U.S Dep't of Transp., Fed. Motor Carrier Safety Admin., *2020 Pocket Guide to
Large Trucks and Bus Statistics* (2020) ................................................................2

U.S. Dep't of Transp., Privacy Impact Assessment, Federal Motor Carrier Safety
Administration (FMCSA) Electronic Logging Devices Final Rule (2015) .........5, 9

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ..............................................................................................13

Fed. R. Civ. P. 12(b)(6) ....................................................................................... *passim*

Fed. R. Evid. 201(b)(2) ...............................................................................................2

*Black's Law Dictionary* 1247 (10th ed. 2014) .........................................................14

Plaintiff David Karling ("Plaintiff"), a truck driver employed by Massachusetts-based Lily Transportation ("Lily"), seeks to misapply the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), to California-based Defendant Samsara Inc.'s ("Samsara") provision of federally regulated truck safety technology to its customers. This attempt to use a unique Illinois statute to override federal regulation of biometric technology in truck safety systems regularly used across state lines stretches state law well beyond its permissible use. Samsara thus respectfully submits that the Court should reject Plaintiff's effort to improperly apply BIPA here and dismiss this action under Rule 12(b)(6) of the Federal Rules of Civil Procedure for several reasons.

First, under long-standing legal principles, Plaintiff's attempt to apply BIPA to safety technology used in interstate trucking, which would disrupt the federal regulatory scheme and discourage the use of federally approved biometric technology, is squarely preempted by federal law.

Second, Plaintiff's effort to apply BIPA to Samsara's truck safety technology would place a patently unconstitutional burden on interstate commerce and is barred by the Dormant Commerce Clause of the United States Constitution.

Third, and in all events, Plaintiff fails to state an actionable BIPA claim against Samsara under Sections 15(a), 15(b), 15(c), or 15(d).

In short, Plaintiff's complaint suffers from multiple fundamental defects as a matter of law and should be dismissed in its entirety.

## BACKGROUND

I.      **The Federal Government's Long-Standing Regulation of Interstate Trucking Safety**

For nearly a century, the federal government has extensively regulated interstate freight transportation. Commercial interstate trucking is a key element of the United States economy, with an estimated 72% of domestic freight in 2020 (amounting to $732.3 billion) transported by truck,[1] and Congress has a keen interest in ensuring that it flows smoothly, efficiently, and safely.

Unfortunately, however, commercial truck driving is among the most dangerous jobs in the United States.[2] Over 5,000 large trucks[3] and buses were involved in fatal crashes in 2018, an increase from 2017,[4] and from 2009 to 2018, fatal accidents involving large trucks and buses increased by 45%.[5] Because of the strong national interest in trucking safety, Congress has demanded that no fewer than four federal agencies—the United States Department of Transportation ("DOT") and its component offices the Federal Motor Carrier Safety Administration ("FMCSA") and the National Highway Transit Safety Administration ("NHTSA"), as well as the Transportation Security Administration ("TSA") (part of the

---

[1] *See Economics and Industry Data*, Am. Trucking Ass'n, https://www.trucking.org/economics-and-industry-data (last visited Feb. 24, 2022). The Court may take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2). Judicially noticed documents may be considered in connection with a Rule 12(b)(6) motion to dismiss without converting such a motion into a motion for summary judgment. *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 283-4 (7th Cir. 1994).

[2] *Census of Fatal Occupational Injuries Summary, 2020*, U.S. Bureau Lab. Stat. (Dec. 16, 2020), https://www.bls.gov/news.release/cfoi.nr0.htm ("Transportation incidents remained the most frequent type of fatal event with 1,778 fatal injuries, accounting for 37.3 percent of all work-related fatalities.").

[3] U.S Dep't of Transp., Fed. Motor Carrier Safety Admin., *2020 Pocket Guide to Large Trucks and Bus Statistics* (2020), https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2020-10/FMCSA%20Pocket%20Guide%202020-v8-FINAL-10-29-2020.pdf.

[4] *Large Truck and Bus Crash Facts 2018*, U.S. Dep't of Transp., Fed. Motor Carrier Safety Admin. (Oct. 2, 2020), https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-and-bus-crash-facts-2018.

[5] *Id.*

Department of Homeland Security)—work together to promulgate and enforce a uniform system of interstate trucking safety regulations to remedy this persistent roadway safety problem.[6]

Just last month, DOT reiterated that the federal government "is responsible for overseeing the safe operation of commercial trucks[,]" and released a National Roadway Safety Strategy, which announces the "Safe Systems Approach as the guiding paradigm to addressing roadway safety."[7] Proactive safety, including "[i]ncentivizing the inclusion of technologies in new motor vehicles" to "help to reduce the frequency of crashes, and to reduce the severity of the outcomes when they do occur," is a key principle of DOT's Safe Systems Approach.[8] In fact, one of the stated "Key Departmental Actions to Enable Safer Vehicles" is to "identify areas of most promising vehicle technology that may lead to subsequent analysis and possible FMVSS [Federal Motor Vehicle Safety Standards] rulemakings, such as . . . systems to detect distracted driving."[9]

Last year, Congress also passed the landmark bipartisan Infrastructure Investment and Jobs Act ("IIJA"), which, amongst a host of provisions regulating interstate trucking, requires the implementation of certain federal motor vehicle safety and performance standards, including a rule

---

[6] *See, e.g.*, Motor Carrier Act of 1935, Pub. L. No. 74-255, 49 Stat. 543; Department of Transportation Act of 1966, Pub. L. No. 89-670, 80 Stat. 931; Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. 2097; National Driver Register Act of 1982, Pub. L. No. 97-364, 96 Stat. 1738; Tandem Truck Safety Act and Motor Carrier Safety Act of 1984, Pub. L. No. 98-554, 98 Stat. 2829; Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207; Truck and Bus Safety and Regulatory Reform Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181; Motor Carrier Safety Act of 1990, Pub. L. No. 101-500, 104 Stat. 1218; Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113 Stat.1748; Moving Ahead for Progress in the 21st Century Act, Pub. L. 112-141, 126 Stat. 405 (2012); Fixing America's Surface Transportation Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015).

[7] *National Roadway Safety Strategy*, U.S. Dep't of Transp. 15-16, 6 (Jan. 2022) https://www.transportation.gov/sites/dot.gov/files/2022-02/USDOT-National-Roadway-Safety-Strategy.pdf

[8] *Id.* at 22.

[9] *Id.* at 24.

prescribing a safety standard for vehicle technology that prevents drunk and impaired driving.[10] It also specifically directs DOT to research the use of driver monitoring systems to minimize or eliminate driver distraction[11] and authorizes DOT to use this research to make rules, including rules incorporating privacy and data security safeguards.[12]

These efforts by Congress to regulate interstate trucking date back to the Motor Carrier Act of 1935, which directed the Interstate Commerce Commission to begin regulating the maximum hours of service ("HOS") for commercial drivers. Pub. L. No. 74-255, § 204(a)(1), 49 Stat. 543.[13]

HOS regulations cap both the number of hours a driver can operate a vehicle during a given period and how long the driver must rest before operating it again. *See* 49 C.F.R. part 395. Drivers previously used paper logs to record their time on the road for purposes of complying with HOS regulations, *see* 65 Fed. Reg. 25,562 (May 2, 2000)), but Congress directed federal transportation agencies to evaluate the use of technology to ensure compliance with HOS regulations to increase accuracy and safety. *See, e.g.*, Motor Carrier Safety Act of 1984, Pub. L. 98–554, Title II, 98 Stat. 2832; Truck and Bus Safety and Regulatory Reform Act of 1988, Pub. L. 100–690.

In 2010, the FMSCA promulgated a rule authorizing the use of biometric data in conjunction with electronic logging HOS devices known as "electronic on-board recorders," or "EOBRs." *See* 49 C.F.R. § 395.16. The regulation identified biometrics as a permissible manner of identifying drivers in connection with the use of EOBRs. 49 C.F.R. § 395.16(j). ("For the driver

---

[10] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 23006, 135 Stat. 429 (2021).

[11] *Id.* § 24209.

[12] *See, e.g.*, *id.* § 24209(c)(2) (stating "Privacy.—A rule issued pursuant to paragraph (1) shall incorporate appropriate privacy and data security safeguards, as determined by the Secretary.").

[13] Jurisdiction over HOS regulations currently resides with the FMCSA. *See Owner-Operator Ind. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 193 (D.C. Cir. 2007) (discussing regulatory history)).

to log into the EOBR, the EOBR must require the driver to enter information (such as a user ID and password) that identifies the driver or to provide other information (**such as smart cards, biometrics**) that identifies the driver.") (emphasis added).

In 2012, Congress ordered DOT to issue regulations requiring most commercial vehicles to "be equipped with an electronic logging device to improve compliance by an operator of a vehicle with hours of service regulations." 49 U.S.C. § 31137(a)(1). Congress specified several factors for DOT to consider in implementing the electronic logging device ("ELD") mandate, including driver privacy and the confidentiality of personal data. *See id.* §§ 31137(d)(2), 31137(c). FMSCA issued its Final ELD Rule in 2015. 80 Fed. Reg. 78,292 (Dec. 16, 2015) (the "ELD Rule"). Under the ELD Rule, drivers must "log into the ELD system using their proper identification data." 49 C.F.R. § 395.22(e). In its Privacy Impact Assessment for the ELD Rule, DOT noted that commercial motor vehicle drivers "may use other means (such as a smart card **or a biometric reader) that uniquely identifies the driver to the ELD**" as an alternative to a traditional username/password login method.[14]

## II. Samsara's Provision Of ELDs And Other Safety Technology To Interstate Trucking Companies

Samsara provides safety technologies to long-haul freight companies, including driver monitoring systems that use internet-connected dashboard cameras ("Dash Cams"), and ELDs. (Compl. ¶¶ 11, 20, 21.) Some Samsara Dash Cams face into the truck cab to allow Samsara's customers to identify and monitor drivers for safety reasons, including for signs of exhaustion or

---

[14] U.S. Dep't of Transp., Privacy Impact Assessment, Federal Motor Carrier Safety Administration (FMCSA) Electronic Logging Devices Final Rule, at 19 (2015) https://www.transportation.gov/sites/dot.gov/files/docs/Privacy%20-%20FMCSA%20-%20ELD%20-%20PIA%20-%20Approved%20-%20121615.pdf (emphasis added).

distraction. (*Id.* ¶¶ 20, 21.) Samsara also offers its customers a feature known as "Camera ID," which uses facial recognition technology that can be used to identify drivers, including for purposes of assigning them to routes in conjunction with a Samsara ELD. (*Id.* ¶ 23; *see also* ¶ 24 n.4, attached hereto as Ex. 1, Samsara, *Using Camera ID for Assigning Unassigned Hours of Service*.)[15] If a Samsara customer chooses to opt in to and enable Camera ID, the customer must first certify—twice—to Samsara that the customer has provided its employees with any notices and obtained any consents that are required under applicable law.

### III.    Plaintiff Alleges That Samsara's Provision Of Truck Safety Technology To Its Customers Violates BIPA.

Plaintiff alleges that he was employed by Lily and that, in 2021, Lily installed and "required him to use" a Dash Cam provided by Samsara in the truck he operated. (Compl. ¶¶ 38, 40, 42.) Plaintiff contends that Samsara is subject to Sections 15(a), (b), (c), and (d) of BIPA because Lily purchased and uses Samsara's driver safety technology. Among other things, Plaintiff pleads that, whenever a Samsara customer chooses to use Camera ID to identify a driver who is physically in Illinois (regardless whether that driver is an Illinois resident or a resident of another state), Samsara is required to first provide that driver with written notice under Section 15(b) of BIPA, and obtain from the driver an executed written release under Section 15(b). (*Id.* ¶¶ 63–64, 68–69.)

### ARGUMENT

The Court should squarely reject Plaintiff's overreaching attempt to apply BIPA to these Samsara safety technologies and dismiss this action in its entirety under Fed. R. Civ. P. 12(b)(6).

---

[15] The Court can consider these publicly available documents, which Plaintiff references in his complaint, and which are central to Plaintiff's BIPA claims, in resolving this motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See, e.g.*, *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993).

6

I.       **Plaintiff's Claims Against Samsara Are Preempted By Federal Law.**

Federal law preempts state law when that state law poses an obstacle to the accomplishment of federal goals or frustrates the purpose of federal laws and regulations. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000). The Supreme Court has additionally held that state law can interfere with federal goals by frustrating Congress's intent to adopt a uniform system of federal regulation. *See Geier v. American Honda Motor Co.,* 529 U.S. 861, 874–75 (2000); *Felder v. Casey*, 487 U.S. 131, 153 (1988).

This case presents a straightforward application of these long-standing, settled federal preemption principles. Plaintiff's proposed application of BIPA to Samsara would replace a uniform scheme of federal regulation of truck safety technologies with a patchwork of differing state regulations *and* would frustrate Congress's specific, expressed intent to *encourage* the use of biometric technology to authenticate truck drivers' identities in connection with ELD operation. *See Crosby*, 530 U.S. at 373 (asserting that to determine whether state law presents such an obstacle, courts should examine the purpose and intended effects of the relevant federal law). Either of those results alone would be sufficient to preempt Plaintiff's claims under federal law; together, it is hard to imagine a more clear-cut case for preemption.

**Federal Uniformity:** When the purpose of federal law is "to create uniform standards for commercial motor vehicles," it preempts state law restrictions that serve as an obstacle to "Congress' overarching goal of uniformity." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1036 (7th Cir. 2008). "Where uniformity is essential for the functioning of commerce, a state may not interpose its local regulation." *Morgan v. Virginia*, 328 U.S. 373, 377 (1946). Uniformity prevents uncertainty surrounding a motor carrier's potential liability or obligations, s*ee, e.g.*, *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir. 1987) (finding that a state common law suit was preempted under the Interstate Commerce Act because it defeated the goal of

establishing "uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability" and "inject[ed] uncertainty back into this area of transportation Congress sought to regulate") (superseded by federal statute).

The Seventh Circuit has already made clear that Plaintiff's attempt to apply BIPA to a provider of ELDs and other safety technologies is preempted because it threatens to disrupt the uniform system of federal regulation of interstate trucking safety that Congress created. In *Aux Sable*, the Seventh Circuit considered an Illinois township's law limiting truck weights on a road that trucks used to access an interstate highway. *Aux Sable*, 526 F.3d at 1031. Plaintiff, a propane loading company, argued that the township law was preempted by the Surface Transportation Assistance Act, 49 U.S.C. § 31114 (the "STAA"), because it effectively denied reasonable access to the interstate by creating weight restrictions for trucks. *Id.* The Court agreed, finding that Congress's primary objective in passing the STAA was to "create uniform standards for commercial motor vehicles" on federal highways, and that this goal would be frustrated if the local law was upheld. *Id.* at 1036. Burdening Samsara's provision of technology with BIPA's particular advance notice and executed written release requirements, only while the truck is physically located in Illinois, would similarly require Samsara to provide technology to comply not with federal law, but rather solely with BIPA, disrupting the uniform system of regulation that Congress sought to create. Federal law preempts that requirement. *Aux Sable*, 526 F.3d at 1036–37.

**Federal Encouragement:** Where, as here, federal agencies have decided to authorize and encourage development of multiple types of safety mechanisms, state law cannot pick and choose some of those types by imposing restrictions that discourage others. In *Geier*, for example, the United States Supreme Court rejected an attempt by plaintiffs to use state law to effectively require the use of one type of passive safety technology (specifically, airbags) over a federally authorized

8

mix of other technology both passive (*e.g.*, automatic belts) and manual (*e.g.*, ignition interlock and warning buzzers). *Geier*, 529 U.S. at 881. The Court concluded that the *Geier* plaintiffs' attempt to impose a state-law airbag requirement "would have presented an obstacle to the variety and mix of devices that federal regulation sought." *Id.*

The same result would flow from Plaintiff's suit here. By purporting to require Samsara to provide manual technology solely to comply with alleged requirements under Section 15(b) of BIPA—and by seeking sizeable damages—claims like Plaintiff's claim will discourage Samsara and other technology providers from developing biometric-enabled ELDs and other passive truck-safety technologies, in favor of manual smart card, username/login, and other technologies, and discourage them from supplying such passive truck-safety technologies to any company that potentially could use them in Illinois. This directly frustrates the federal government's intent not only to regulate the use of biometric authentication mechanisms used in conjunction with ELDs, but also to *encourage* the use of such truck-safety technologies to promote safety in interstate trucking. *See, e.g.,* Privacy Impact Assessment, *supra* note 14, at 19; Safety Strategy, *supra* note 7, at 3.[16] In doing so, both Congress and the federal transportation agencies responsible for commercial vehicle safety expressly considered potential privacy concerns related to the use of ELDs: both the enabling legislation and the ELD Rule specifically addressed issues of driver harassment and data privacy. *See* 49 U.S.C. §§ 31137(a)(2), (requiring the Secretary of

---

[16] Other examples of Congress and federal agencies encouraging the use of biometric technology in interstate trucking safety include: (1) use of biometric data in commercial drivers' license applications, *see* 49 U.S.C. § 31308(3); (2) the FMSCA's proposed rulemaking relating to biometric technologies in motor carrier vehicles, *see Minimum Uniform Standards for a Biometric Identification System to Ensure Identification of Operators of Commercial Motor Vehicles; Withdrawal*, U.S. Dep't of Transp., Fed. Motor Carrier Safety Admin., https://www.fmcsa.dot.gov/regulations/rulemaking/05-9171 (May 9, 2005) ; (3) the TSA's Transportation Worker Identification Card ("TWIC") program, *see* 49 C.F.R. § 1572.17(c); and (4) ongoing TSA biometric pilot programs and research (*see e.g.,* TSA, *Biometrics Technology,* https://www.tsa.gov/biometrics-technology.)

Transportation to prescribe regulations preventing harassment), 31137(d)(2) (privacy).

As the Seventh Circuit has noted, "Congress meant for [DOT] to balance competing goals"—driver privacy and transportation safety—and "[t]he agency understood this and balanced the competing directives in a reasonable manner" when it passed the ELD Rule. *Owner-Operator Ind. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 888 (7th Cir. 2016). And just a few months ago, Congress unequivocally stated that DOT will be responsible for incorporating privacy and data security safeguards into rules regarding driver monitoring systems. *See, e.g.*, IIJA, Pub. L. No. 117-58, § 24209(c)(2) (requiring the incorporation of "appropriate privacy and data security safeguards, as determined by the Secretary"). When the federal government has gone to such lengths to conduct a careful balancing test and ultimately decided to encourage biometric technologies like those offered by Samsara, a single state's law simply cannot supersede it. *Geier*, 529 U.S. at 880–81.

Plaintiff's effort to apply BIPA to Samsara's provision of federally regulated technology thus would pose a substantial obstacle to, and severely frustrate, Congress's goal of encouraging the use of technology to ensure interstate trucking safety, and is squarely preempted under federal law. *Crosby*, 530 U.S. at 372–73.

For these reasons, Plaintiff's claims against Samsara thus are preempted by federal law and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    Plaintiff's Claims Violate the Dormant Commerce Clause.

Separately and independently, Plaintiff's claims should be dismissed under Rule 12(b)(6) because applying BIPA to Samsara here violates the Dormant Commerce Clause.

The Dormant Commerce Clause limits the power of the states to discriminate against or burden interstate commerce. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). The Supreme Court has adopted a two-tier approach for analyzing state

regulation under the Commerce Clause. A heightened scrutiny tier applies to "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *See Healy v. Beer Institute*, 491 U.S. 324, 336–37 (1989).[17] This includes extraterritorial legislation "governing the services and commercial relationships between out-of-state [entities] and their employees and contractors." *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 833 (7th Cir. 2017). When "states actually attempt to regulate activities in other states," such regulations are invalid under the Commerce Clause, even without the need to balance any arguable local benefit against out-of-state burden. *See Midwest Title*, 593 F.3d at 665.[18]

Samsara respectfully submits that the heightened scrutiny standard applies here, and that this case presents a straightforward application of the principles set forth by the Supreme Court in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959) and in *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662 (1981). In *Bibb*, the Court held that an Illinois statute requiring that all trucks operated on Illinois highways have a particular type of mudguard imposed an unconstitutional burden on interstate commerce, noting, "[a] state which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory." 359 U.S. at

---

[17] A direct conflict between two state statutes is not required: it is enough that one state lacks a counterpart to the challenged law, indicating that the other state "thinks [the conduct] shouldn't be restricted in the [same] way[.]" *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 667 (7th Cir. 2010). Without this rule, "any state that has chosen a policy more *laissez faire* than [another state's] would have its choices stymied, because the state that has chosen more regulation could always trump its deregulated neighbor." *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998).

[18] The second, more accommodating tier of scrutiny applies when a nondiscriminatory state or local statute has incidental effects on interstate commerce. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Such statutes are subject to a balancing test weighing local benefit against out-of-state burden. Samsara reserves its rights to assert that Plaintiff's claims also fail under the *Pike* balancing test (considering, among other things, the significant out-of-state burden that applying BIPA here would create, and that it would make Illinois drivers *less* safe) though Samsara does not do so in this motion.

530–31. And in *Kassel*, the Court found that Iowa's truck length limitations had no demonstrable connection to safety, and unconstitutionally burdened interstate commerce. 450 U.S. at 1316–17.

Here, Plaintiff's effort to extend BIPA to apply to interstate trucking safety technology— and to out-of-state companies like Samsara that provide that technology to out-of-state companies like Lily—would place a "great burden" on interstate motor carriers and their technology providers and would substantially interfere with interstate commerce. *See Bibb*, 359 U.S. at 530; *Legato*, 847 F.3d at 833. Nearly half of all truck miles are driven on the interstate highway system.[19] Applying BIPA to Samsara whenever a driver working for one of Samsara's interstate trucking customers uses the technology while physically present in Illinois would require Samsara either to ensure compliance with BIPA everywhere Samsara does business or, absurdly, to prohibit its customers from using Samsara technology while driving in Illinois due to risk of noncompliance.[20] That would place a significant burden on Samsara, interfere with interstate commerce, and improperly project Illinois law into other states. *See Bibb* 359 U.S. at 529–30; *Kassel*, 450 U.S. at 1316–17; *Midwest Title*, 593 F.3d at 665.

Plaintiff's claims against Samsara thus violate the Dormant Commerce Clause, and should be dismissed under Rule 12(b)(6).

## III.    Plaintiff Fails to Plausibly Allege a BIPA Claim Against Samsara

As an additional, independent basis for dismissal, Plaintiff fails to plausibly allege any claim under BIPA against Samsara, and the Complaint should be dismissed under Rule 12(b)(6).

---

[19] *See* U.S. Dep't of Transp., Fed. Highway Admin., Freight Facts and Figures 2011 at 28 (Nov. 2011) https://ops.fhwa.dot.gov/freight/freight_analysis/nat_freight_stats/docs/11factsfigures/pdfs/fff2011_highres.pdf.

[20] To the extent that Plaintiff were to argue that Samsara could stop providing truck-safety technology to customers based in Illinois, that would ignore that Samsara's customers outside Illinois may independently choose to send their employees into Illinois.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (noting that Fed. R. Civ. P. 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief," and the showing must include enough facts to "raise a right to relief above the speculative level.").

### A.      Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(a) of BIPA.

Plaintiff asserts that Samsara violated Section 15(a) of BIPA by "fail[ing] to provide a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA." (Comp. ¶ 59.) Plaintiff, however, bizarrely ignores that he begins his complaint by *citing to* Samsara's publicly available retention and deletion policy. (*See id.* ¶ 1, n. 1 (a copy of the document referenced by Plaintiff is attached as Exhibit 2).) Exhibit 2 squarely contradicts Plaintiff's allegation that Samsara does not have a publicly available, BIPA-compliant retention and destruction policy. It is well-established that a document outside the pleadings controls when it is incorporated by reference or attachment and directly contradicts the assertions in the complaint. *See, e.g., Baker v. Northwestern Medicine Lake Forest Hospital*, No. 16-CV-05669, 2017 WL 2908766, at *4 (N.D. Ill. July 7, 2017) (citing *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010)).

Plaintiff thus fails to plausibly allege that Samsara violated Section 15(a) of BIPA, and his claim should be dismissed.

### B.      Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(b) Of BIPA.

The text of BIPA makes clear that, when biometric data is collected in the workplace, the notice and release obligations in Section 15(b) apply only to the employer.

BIPA states that, in "the context of employment," the "written release" required under Section 15(b) is "a release executed *by an employee as a condition of employment*." 740 ILCS 14/10 (emphasis added). This makes sense because it is the employer who (a) has a relationship

13

with the employees, (b) controls and directs the collection of biometric information, and (c) therefore can provide the required written notice, and obtain an executed release, before collection occurs. *See Bernal v. ADP, LLC*, 2019 WL 5028609, at *1–2 (Ill. Cir. Ct. Aug. 23, 2019) (dismissing Section 15(b) claim against technology provider); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) (dismissing Section 15(b) claim against technology-provider defendant because it was clear from the complaint that it was the employer who collected the data using a system provided by the technology-provider defendant).

Moreover, the Illinois General Assembly drew an important distinction between the obligations placed upon companies that "possess" biometric data and the obligations placed upon companies that actually collect data from an individual. Each of the subsections of Section 15 other than (b) apply to entities "in possession of" biometric data. *See* 740 ILCS 14/15(a), (c), (d) & (e). Section 15(b) uses different language. It applies to entities that "collect, capture, purchase, receive through trade, or otherwise obtain" biometric data from an individual. *Id.* § 15(b).[21] Thus, "possession" alone does not make an entity subject to the notice and consent obligations of Section 15(b).

In *Bernal*, the court noted that plaintiff had alleged that his employer—not ADP—required him to use a finger-scan timeclock to clock in and out of work, and that ADP was a third-party

---

[21] The General Assembly's inclusion of the phrase "or otherwise obtain" at the end of the list of acts that trigger Section 15(b)'s obligations does not broaden Section 15(b) to include receipt or possession. Like the first four verbs, "obtain" covers only the active acquisition of biometric data. *See Black's Law Dictionary* 1247 (10th ed. 2014) (defining "obtain" as "[t]o bring into one's own possession; to procure, esp. through effort"). Interpreting "otherwise obtain" more broadly would violate the cardinal rule of statutory construction that, when "a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted to mean 'other such like.'" *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 492 (2009). Moreover, interpreting "otherwise obtain" to simply mean any possession of biometric data would render superfluous the preceding specific verbs, because each of those specific verbs necessarily involves possession. *See id.* ("If the legislature had meant the general words to have their unrestricted sense, it would not have used the specific words.").

vendor that provided the timeclock technology to Bernal's employer. The court held that Bernal had failed to state any claim under BIPA against ADP, because, among other things, he failed to plead sufficient facts describing "what [ADP]'s role relative to Plaintiff's biometric information is," describing whether ADP had any "actual involvement" in the alleged collection of Bernal's biometric identifiers and biometric information, or describing whether ADP had any "direct relationship" with Bernal. 2019 WL 5028609, at *1–2.

Plaintiff does not—and cannot—plead any specific facts establishing any relationship between Plaintiff and Samsara, much less an employer-employee relationship. For example, Plaintiff does not—and cannot—allege that Samsara personnel were present when Plaintiff used Camera ID, that Samsara required Plaintiff to use Camera ID, or that Samsara was Plaintiff's employer. Indeed, Plaintiff does not allege that he had any relationship with Samsara, or ever interacted or communicated with Samsara. (*See* Compl. ¶¶ 1–90.) Nor does Plaintiff plead any facts plausibly alleging that Samsara—in contrast to Plaintiff's employer, using the Samsara Dash Cam—collected his biometric data. (*See id.*)

Plaintiff's conclusory assertions that Samsara "collected" Plaintiff's biometric data thus fall short of plausibly alleging that Samsara collected or captured Plaintiff's biometric data. *See, e.g., Bernal,* 2019 WL 5028609, at *1–2; *Leroy Jacobs v. Hanwha Techwin America, Inc.,* No. 21 C 866, 2021 WL 3172967, at *3 (N.D. Ill. July 27, 2021) (dismissing Section 15(b) claim, and noting that "a complete reading of the complaint makes clear that defendant is merely a third-party technology provider"); *Namuwonge,* 418 F. Supp. 3d at 286. Plaintiff thus has failed to plausibly allege that Samsara collected his biometric data, and his Section 15(b) claim should be dismissed.

### C. Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(c) of BIPA.

Plaintiff's claim under Section 15(c) of BIPA should be dismissed because Section 15(c) applies to the sale of biometric data, not to the sale of biometric technology.

Section 15(c) of BIPA prohibits "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c). Plaintiff does not allege that Samsara sold, leased, or traded his biometric data (*see* Compl. ¶¶ 1–90); instead, Plaintiff asserts that Samsara only "*receives* biometric information . . . to allow Defendant to provide services to Plaintiff's employer." *Id.* ¶ 31 (emphasis added). Plaintiff bases his Section 15(c) claim on allegations that Samsara "profits" from "Plaintiff's and similarly situated individuals' biometrics" when it "contracts with its transportation-industry customers" to sell them biometric technology. (*Id.* ¶¶ 9, 30, 37, 79.)

Section 15(c), however, does not prohibit a company from selling biometric technology. It prohibits selling, leasing, or trading the biometric *data* itself, which Plaintiff has not alleged. The General Assembly's addition of the ancillary phrase "sell, lease, trade, *or otherwise profit from* [biometric data]," 740 ILCS 14/15(c) (emphasis added), is intended to prohibit only other transfers of biometric data for consideration similar to selling, leasing, or trading biometric data, which the legislature could not "spell[] out in advance." *See Pooh-Bah,* 232 Ill.2d at 492.

The clause "or otherwise profit from" is meant to reinforce the prohibition on selling, leasing, or trading biometric data; it is not meant to broadly prohibit the separate act of furnishing biometric devices or services. See *Bernal,* 2019 WL 5028609, at *1–2 (dismissing 15(c) claim based on selling biometric technology on grounds that such actions do not constitute profit from sale or lease of biometric information); *Vance v. Microsoft Corp.,* Case No. C20-1082JLR, 2021 WL 1401634, at *3–4 (W.D. Wash. April 14, 2021) (rejecting plaintiff's argument that Section 15(c) prohibits any use of biometric data that generates profits).

Indeed, if Section 15(c) were construed to prohibit any profitmaking activity related to biometric technology, BIPA's entire statutory framework would become unnecessary. No entity

could provide biometric technology in Illinois, and the very purpose of BIPA—to "regulat[e]" "biometric-facilitated transactions"—would be eliminated. 740 ILCS 14/5(c), (g); *see Vance,* 2021 WL 1401634, at \*4 (noting that such an interpretation of Section 15(c) "would lead to absurd results that contravene BIPA itself."). Indeed, the Illinois legislature made clear that it passed BIPA in order to *encourage* the "use of biometrics." 740 ILCS 14/5(a). Plaintiff thus fails to plausibly allege a violation of Section 15(c), and his claim should be dismissed.

### D.   Plaintiff Fails to Plausibly Allege Samsara Violated Section 15(d) of BIPA.

Section 15(d) of BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1). Plaintiff fails to allege that Samsara violated Section 15(d) because he fails to plead sufficient facts to plausibly allege that Samsara ever improperly disclosed or disseminated his biometric data.

While Plaintiff makes rote assertions that Samsara "disclosed" and "disseminated" his biometric data to "other third parties, including Plaintiff's employer," (Compl. ¶¶ 32, 88), Plaintiff does not plead any facts describing when or how such improper disclosure or dissemination supposedly occurred. (*See id.* ¶¶ 1-90.) And although Samsara provides a web-based service to its customers that presents, among other things, automatic driver assignments and distracted driving alerts intended to increase the safety of its customers' operations (*see* Ex. 1), Plaintiff does not plausibly allege that Samsara discloses or disseminates biometric data to its customers as part of that service. This falls far short of pleading a plausible claim under Section 15(d). *See Jacobs,* 2021 WL 3172967, at \*4 (dismissing Section 15(d) claim, and noting, "Plaintiff has not presented any legitimate reason to suspect that defendant disclosed his biometric data or that of the putative class members."). Plaintiff's Section 15(d) claim thus should be dismissed.

### E. Plaintiff Fails To Plausibly Allege That Samsara Intentionally Or Recklessly Violated BIPA.

Finally, this Court should dismiss Plaintiff's claims seeking enhanced statutory damages of $5,000 per violation. (*See* Compl. ¶¶ 61, 71, 81,  90.) Under the plain language of BIPA, a plaintiff only may recover such damages if he establishes that a defendant's violations of the statute were intentional or reckless. *See* 740 ILCS 14/20. Plaintiff's complaint, however, is wholly devoid of any facts showing that the alleged violations of BIPA were intentional or reckless in nature. (*See* Compl. ¶¶ 1-90.) Plaintiff thus fails to plausibly allege that Samsara violated BIPA intentionally or recklessly. *See Namuwonge*, 418 F. Supp. 3d at 286; *Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 618 (N.D. Ill. 2019). Nor has Plaintiff alleged that Samsara "made no effort to comply with BIPA." *Peatry v. Bimbo Bakeries USA, Inc.*,  No. 19 C 2942, 2020 WL 919202, at *6 (N.D. Ill. Feb. 26, 2020). Thus, Plaintiff's claims for enhanced statutory damages should be dismissed under Rule 12(b)(6).

## CONCLUSION

WHEREFORE, for all the reasons set forth above, Defendant Samsara Inc. respectfully requests that the Court grant the motion to dismiss and enter an Order dismissing the Complaint in its entirety and with prejudice, and providing for such other and further relief as is just and proper.

Dated: February 24, 2022       Respectfully submitted,

               SAMSARA INC.

               By: */s/ David C. Layden*
                 One of its attorneys

David C. Layden
Elena M. Olivieri
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

## **CERTIFICATE OF SERVICE**

I certify that on February 24, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a Notice of Electronic Filing to all counsel of record.

*/s/ David C. Layden*