## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVID KARLING, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 22 C 295 |
| v. | ) ) | Judge Sara L. Ellis |
| SAMSARA INC., a Delaware Corporation, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff David Karling, on behalf of himself and a putative class, alleges that Defendant Samsara Inc., violated the Illinois Biometric Information Privacy Act, 740 ILCS § 14/1, *et seq.* ("BIPA"), by: collecting his information from facial scans without notice or release; disseminating that information to third parties; failing to create, disclose and adhere to a written policy for data retention and destruction; and profiting from these actions. Karling sued in the Circuit Court of Cook County, and Samsara removed the case to this Court. Samsara now moves to dismiss Karling's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the Court finds that it requires a fuller factual record to consider Samara's preemption and dormant Commerce Clause arguments and that Karling has sufficient alleged various BIPA violations, the Court denies Samsara's motion to dismiss.

## BACKGROUND[1]

Samsara provides facial recognition software and sensors to commercial fleets and industrial operations. The Samsara cameras capture the actions of the drivers to monitor for

---

[1] The Court takes the facts in the background section from Karling's complaint and presumes them to be true for the purpose of resolving Samsara's motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

fatigue and distraction. Karling worked in Illinois as a driver for Lily Transportation, a customer of Samsara. In 2021, Lily Transportation installed an AI Dash Camera, provided by Samsara, in Karling's truck. The AI Dashcam extracted biometric identifiers from Karling's face while he drove and sent them to the Samsara Cloud Dashboard, where Samsara stored the images. The Samsara Camera includes a feature called Camera ID, which automatically performed facial recognition to identify Karling by extracting biometric identifiers and comparing those to the stored data. Karling never gave permission for the collection and storage of his biometric data. Samsara never provided Karling with a written release, the required statutory disclosures, or a retention and destruction policy. Karling never signed a written release or had an opportunity to prevent this collection and use of his biometric data.

BIPA, enacted in 2008, protects a person's biometric identifiers, including facial scans. 740 ILCS § 14/10. It also separately protects biometric information, which is information based on these identifiers that is used to identify an individual. *Id.* Specifically, BIPA makes it unlawful to: "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers and/or biometric information, unless [the company] first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

*Id.* at § 14/15(b).

BIPA requires a publicly available limited retention and destruction policy:

> A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

*Id.* at § 14/15(a). It prohibits a company from "sell[ing], leas[ing], trad[ing] or otherwise profit[ing] from a person's or the customer's biometric identifier or biometric information." *Id.* at § 14/15(c). And it requires the subject's consent to disclose, redisclose, or otherwise disseminate that information. *Id.* at § 14/15/(d).

Karling alleges that Samsara's camera and software collected his and other putative class members' biometric identifiers or biometric information without their permission, and that Samsara, through its contracts with transportation-industry customers, profited from this use. He further alleges that Samsara disseminated those biometrics to third parties, including Karling's employer, Lily Transportation.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Preemption

Samsara first seeks dismissal of the complaint on the basis that Karling's proposed application of BIPA would disrupt "a uniform scheme of federal regulation of truck safety technology" and "frustrate Congress's specific, expressed intent to *encourage* the use of biometric technology to authenticate truck drivers' identities in connection with ELD [electronic hours logging device] operation." Doc. 17-1 at 14 (emphasis in original). Karling argues that it is premature to decide Samsara's affirmative defense of preemption without a factual record. Karling further argues that there is no preemption because Samsara does not point to a federal law and explain how it conflicts with BIPA or how BIPA forecloses federal encouragement of biometric safety devices. The Court agrees that it cannot, at this stage of the litigation, find that conflict preemption bars Karling's claims.

Under the Supremacy Clause, lawfully created federal statutes may preempt conflicting state statutes. *DeHart v. Town of Austin*, 39 F.3d 718, 721 (7th Cir. 1994) ("When the federal government acts within its constitutional authority, it is empowered to preempt state or local laws to the extent it believes such action to be necessary to achieve its purposes."). Federal law may preempt state law in three situations: when Congress expressly states so, when a federal regulatory scheme implies exclusive congressional legislative power, and in cases of "actual conflict." *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Samsara argues a kind of conflict preemption, in which a "state or local law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *DeHart*, 39 F.3d at 721

(citations omitted).  The ultimate task in a preemption inquiry "is to ascertain the intent of

Congress."  *Id.* at 722.  The Seventh Circuit has further directed that a "court should not find

conflict preemption 'unless that was the clear and manifest purpose of Congress.'"  *C.Y.*

*Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (citation omitted).

Samsara does not argue that BIPA conflicts with a particular federal statute; rather, it

urges the Court to find "a uniform scheme of federal regulation of truck safety technology"

disrupted by BIPA's Illinois-specific requirements.  Doc. 17-1 at 14.  Samsara states that

Congress has tasked various federal agencies to create a uniform system of interstate trucking

safety regulations and points to the long history of Congressional regulation of trucking safety

generally.  Samsara also cites a recent Department of Transportation ("DOT") "National

Roadway Safety Strategy," published on the DOT website, and its initiative to incentivize

vehicle safety technology including systems to deter distracted driving.  Samsara lists the recent

Infrastructure, Investment, and Jobs Act, Pub. L. No. 117-58, § 23006, 135 Stat. 429 (2021),

which directed DOT to research driver monitoring systems (with the goal of reducing driver

distraction) and authorized DOT rulemaking on these systems (to include privacy and data

security safeguards).  Samsara also refers to a 2012 Congressional mandate that DOT issue

regulations requiring most commercial vehicles to be equipped with an electronic logging device

("ELD") designed to assure compliance with hours-of-service requirements and further directing

that those regulations include considerations of driver privacy and data confidentiality.  Finally,

as proof of this uniform scheme, Samsara points to a Federal Motor Carrier Safety

Administration Privacy Impact Assessment for the ELD Rule in which the agency notes that

biometric identifiers are one possible way to log into an ELD.  Karling counters that Samsara's

collection of references does not create a uniform regulatory scheme such that the clear, preemptive purpose of Congress is evident. The Court agrees.

Preemption is "an affirmative defense upon which the defendants bear the burden of proof." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (quoting *Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005)). Unless the plaintiff has pleaded himself out of court, affirmative defenses do not justify dismissal. *Id.* Furthermore, "pre-emption will not lie unless it is the clear and manifest purpose of Congress." *Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180, at *2 (N.D. Ill. Oct. 31, 2019) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993)). The scattershot nature of Samsara's cited agency statements and proposed rulemaking hardly qualifies as a uniform federal scheme to regulate truck safety technology. The Court cannot find "a clear and manifest" Congressional purpose to preempt state regulation of "truck safety technology" from these disparate sources, which range from a law that directed DOT to conduct research and rulemaking on driver monitoring systems to a recent federal initiative to incentivize driver-safety technologies. Although these sources potentially touch on biometrics and privacy concerns, their overwhelming aim is traffic safety, while BIPA targets "disclosure, consent, and recordkeeping requirements" for biometric identifiers. *See Rogers*, 2019 WL 5635180, at *3.

Samsara argues that this case is akin to *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1037 (7th Cir. 2008), where the Court found conflict preemption when a local roadway weight restriction effectively eliminated a company's federal highway access, citing Congress's objective in creating uniform regulations for "reasonable access" to interstates. But Samsara has not pointed to any clear Congressional regulatory objective that BIPA disturbs. Theoretically, a company like Samsara could create truck safety technology that complies with BIPA. *See*

*Crumpton v. Octapharma Plasma, Inc.*, 513 F. Supp. 3d 1006, 1013–14 (N.D. Ill. 2021) (finding no conflict preemption because defendant may satisfy both the federal law and BIPA). But, at this stage, it is inappropriate to speculate outside the bounds of Karling's complaint. *See Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 896 (N.D. Ill. 2021) (refusing to speculate to find conflict preemption); *Rogers*, 2019 WL 5635180, at *3 (same). The Court cannot find, on this record, that BIPA "stands as an obstacle" to Congress's clear intent regarding truck safety technology.

Without a specific federal law to point to, Samsara tries to bootstrap ELDs (and therefore the ELD regulations) into the complaint by explaining that it also manufacturers ELDs and equating ELDs with the AI Dashcams at issue because both use biometric identifiers. To do this, Samsara makes factual arguments and attaches exhibits, which only serves to highlight the fact-based nature of a conflict preemption inquiry and its usual inappropriateness on a motion to dismiss. *See Fleury*, 528 F. Supp. 3d at 896 ("Tellingly, Union Pacific supports its argument by introducing facts and materials relating to the scope of its operations, which as Fleury points out, cannot be properly considered at this stage.").

Samsara also argues that BIPA discourages the use of truck safety technologies in direct contravention of Congress's intent to encourage such products and will deter companies "from developing biometric-enabled ELDs and other passive truck-safety technologies." Doc. 17-1 at 16. Samsara analogizes this case to *Geier v. American Honda Motor Co.*, 529 U.S. 861, 874–75 (2000), which held that plaintiff's state tort "no airbag" lawsuit was preempted by a DOT Federal Motor Vehicle Safety Standard because to find a duty to install airbags in all cars conflicted with explicit DOT objectives. Parsing the history of the standard and the agency's explanation of its goals, the Court affirmed summary judgment for defendant. *Id.* at 874–84.

There the Court could discern, on a full record, the likely effect of the targeted local ordinance and Congress and the DOT's specific purpose in creating the safety standard. At the motion to dismiss stage, this Court cannot do the same.

## II. Dormant Commerce Clause

Samsara seeks dismissal of the complaint under the Dormant Commerce Clause, arguing that BIPA, as applied to it, places a great burden on "interstate motor carriers and their technology providers and would substantially interfere with interstate commerce." Doc. 17-1 at 19. According to Samsara, BIPA unconstitutionally projects Illinois law onto other states and would place a significant burden on it because it would "require Samsara either to ensure compliance with BIPA everywhere Samsara does business or, absurdly, to prohibit its customers from using Samsara technology while driving in Illinois due to risk of noncompliance." *Id.* Karling argues that, again, the Court should decide this issue on a full factual record. The Court agrees.

The Commerce Clause gives Congress the power to regulate interstate commerce. U.S. Const. art. 1 § 8 cl. 3. The Supreme Court has long understood the Commerce Clause to also "directly limit[] the power of the States to discriminate against or burden interstate commerce." *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003). This dormant Commerce Clause power prohibits "'the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 830 (7th Cir. 2017) (quoting *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989)). "Generally, courts will strike down a statute that directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, without engaging in the more permissive

8

balancing tests applied to non-discriminatory legislation." *Id.* (citations omitted) (quotation marks omitted).  Samsara urges the Court to use strict scrutiny here.

However, "courts have repeatedly rejected the argument that the Dormant Commerce Clause prevents BIPA's application to out-of-state defendants at the motion to dismiss stage and held that the issue is more properly addressed on a motion for summary judgment." *Vance v. Int'l Bus. Machines Corp.,* No. 20 C 577, 2020 WL 5530134, at *4 (N.D. Ill. Sept. 15, 2020) (collecting cases); *see also Rivera v. Google Inc.*, 283 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (whether BIPA as applied controls "commercial conduct wholly outside Illinois is not possible to figure out without a better factual understanding" of the defendant's system); *In re Clearview AI, Inc., Consumer Priv. Litig.*, No. 21-CV-0135, 2022 WL 444135, at *4 (N.D. Ill. Feb. 14, 2022) (same); *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846, at *8 (N.D. Ill. Sept. 15, 2017) (same).  Without discovery into Samsara's processes for scanning, storing, and using biometrics with its dashcam system and the alleged burden of compliance with BIPA, the Court cannot determine whether there is a dormant Commerce Clause violation.  *See Rivera*, 283 F. Supp. 3d at 1103–04 ("[T]his is not the stage at which to assess these arguments in detail.").

### III.    Allegations of BIPA Violations

Samsara also seeks dismissal on the basis that Karling fails to state a claim under any provision of BIPA.

#### a.    Section 15(a)

Section 15(a) requires Samsara to have a "written policy made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied."  740 ILCS § 14/15(a).  Samsara says that it publishes its policy

on a portion of its website titled "Special Features About Camera ID Technology," specifically where the website states: "Samsara keeps facial recognition information for a customer no longer than necessary to provide its Camera ID service to that customer.  To delete facial recognition information stored by Samsara, contact customer support."  Doc. 22 at 14.  Samsara further argues that Karling pleads himself out of court because, although the complaint alleges there is no policy, the complaint also cites to this portion of Samsara's website.  Doc. 17-1 at 20 (citing Doc 1-1 ¶ 1 n.1 (https://www.samsara.com/support/privacy/special-features)).

Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  And Samsara is correct that "[a] document outside the pleadings controls when it is incorporated by reference or attachment and directly contradicts the assertions in the complaint."  *Baker v. Nw. Med. Lake Forest Hosp.*, No. 16-CV-05669, 2017 WL 2908766, at *4 (N.D. Ill. July 7, 2017) (citing *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010)).  However, the Court finds it a stretch to argue that this website language is "central" to Karling's complaint when the complaint only cites the website as the source of introductory background material that does not mention the policy allegations.

But even if the Court were to consider this webpage, Karling counters that this language does not comply with § 15(a) because it does not establish a retention schedule and guidelines for permanent destruction or establish that the data destruction is permanent.  Taking the allegations of the complaint in the light most favorable to Karling, as the Court must at this stage, Samsara's statement that it "keeps facial recognition information for a customer no longer

than necessary to provide its Camera ID service to that customer," does not directly contradict Karling's allegation that Samsara does not have a written retention schedule. Further, the website says nothing about destruction guidelines. Samsara urges the Court to make factual inferences in its favor, but that is not proper on a motion to dismiss. Karling has sufficiently pleaded a § 15(a) claim.

  **b.    Section 15(b)**

Section 15(b) makes it unlawful to, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers and/or biometric information" without a written release. 740 ILCS § 15(b). Samsara argues that Karling's claim fails because this section applies only to an employer, so Karling may not bring a claim against it as a technology provider. Samsara also argues that possession alone does not implicate § 15(b) and Karling does not plead that Samsara, as opposed to the trucking company, collected the data.

Several district courts have considered and rejected Samsara's first argument. The Court also finds that the plain language of the statute does not limit the written consent requirement to employers only; rather, it explains that, "in the context of employment," BIPA requires "a release executed by an employee as a condition of employment." *See* 740 ILCS § 14/10 ("Written release means informed written consent or, in the context of employment, a release executed by an employee as a condition of employment."); *Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1092 (N.D. Ill. 2019) ("[T]he fact that the statute defines 'written release' in a more particularized way for employment situations has no bearing on which entities face liability under the statute . . . . there is no textual support whatsoever for such a restricted view of the statute's application."); *Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 783 (N.D. Ill. 2020) ("This argument fails to persuade."). And as another district court has noted, the written release is not

all that § 15(b) requires. *See Figueroa*, 454 F. Supp. 3d at 783 ("As an initial matter, even putting aside whether Kronos was required to receive from Plaintiffs the written release mandated by Section 15(b)(3), Kronos still (allegedly) violated Sections 15(b)(1) and (b)(2) by not informing them that it was collecting or obtaining their biometric data, for what purposes, and for how long."). Karling has plausibly alleged violations of §§ 15(b)(1) and (2) as well. Doc. 1-1, ¶¶ 28, 68–69.

Samsara relies on an Illinois Circuit Court case, *Bernal v. ADP, LLC*, which approved its argument. No. 2017-CV-12364, 2019 WL 5028609, at *1–2 (Ill. Cir. Ct. 2019) ("As Defendant notes, to read BIPA as requiring that a third party provider of the biometric timeclock technology, without any direct relationship with its customers' employees, obtain written releases from said employees would be unquestionably not only inconvenient but arguably absurd."). However, the *Bernal* court did not dismiss on that basis. *Id.* at *2 ("Yet, based on the pleadings, as written, the Court's decision must ultimately turn on the insufficiency of Plaintiff's Complaint as to § 15(b)."). Like other courts in our district, the Court is not persuaded by *Bernal*'s reasoning and need not follow it. *See Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 842–43 (N.D. Ill. 2021) (finding the *Bernal* Court's "discussion of Section 15(b) is cursory and ultimately unpersuasive").

Samsara is correct that courts have held that § 15(b) does not apply to entities that merely possess rather than "collect, capture, purchase, receive through trade, or otherwise obtain" the data. *See Jacobs v. Hanwha Techwin Am., Inc.*, No. 21 C 866, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021) (collecting cases). However, Karling asserts that Samsara collected his facial geometry through its dashcam system, used AI software to process that data to recognize him, stored his biometric information in its cloud-based dashboard, and then provided access to that

dashboard and services based on that data to his employer. Doc. 1-1, ¶¶ 1, 21, 22–25. Karling has sufficiently alleged Samsara's active collection, storage, and use of his data. *See Jacobs*, 2021 WL 3172967, at *2–3 (noting plaintiff did not allege any active collection on the part of the camera manufacturer, who did not even have access to the surveillance system; rather the employer was collecting and processing the video data); *Heard*, 524 F. Supp. 3d at 841 (allegations that defendant's device scanned fingerprint data, extracted features of the fingerprint to create a user profile, and stored the data on the device and servers sufficient to survive a motion to dismiss). The Court will not dismiss the § 15(b) count.

### c.    Section 15(c)

Samsara seeks dismissal of the § 15(c) claim on the basis that BIPA applies to the sale of "biometric data, not to the sale of biometric technology," and Karling has not alleged that Samsara sold his biometric data. Doc. 17-1 at 15. Section 15(c) prohibits a company from selling, leasing, trading, or otherwise profiting from a person's biometric identifier or information. 740 ILCS § 14/15(c). Karling alleges that Samsara uses its dashcams to collect face scans, uses AI software to perform facial recognition on the data, stores the data in its cloud-based dashboard, and then sells access to that dashboard to its customers. Doc. 1-1, ¶¶ 1, 21, 22–26. Karling alleges specifically: "after capturing and storing [Karling's] biometric information, [Samsara] disseminated those biometrics to other third parties, including [Karling's] employer" and profited from contracts to capture that data and provide services to employers. *Id.* at ¶¶ 31–32, 37. Even under Samsara's urged interpretation of § 15(c), which the Court does not endorse, Karling has sufficiently pleaded that Samsara profited from the sale of his data. *See Flores v. Motorola Sols., Inc.*, No. 1:20-CV-01128, 2021 WL 232627, at *3 (N.D. Ill. Jan. 8, 2021) ("However, Plaintiffs' complaint asserts that Defendants develop the database by extracting

biometric identifiers, compare novel images to the database images to find facial matches, and offer access to that database for a fee to law enforcement. Based on the allegations, biometric data is a necessary element to Defendant's business model. On a motion to dismiss, the Court cannot say that as a matter of law under the statute, this activity does not constitute selling or profiting from biometric information."); *accord Vance v. Microsoft Corp.*, 534 F. Supp. 3d 1301, 1309 (W.D. Wash. 2021) ("Plaintiffs do not allege that Microsoft directly sold biometric data. And unlike in *Flores*, they have not alleged that the biometric data is itself so incorporated into Microsoft's product that by marketing the product, it is commercially disseminating the biometric data."). Karling has sufficiently pleaded a § 15(c) claim.

**d.      Section 15(d)**

Samsara seeks dismissal of Karling's § 15(d) claim, arguing that he does not provide enough facts to plausibly allege that Samsara improperly disclosed or disseminated his biometric data. Section 15(d) prohibits disclosure of biometric identifiers or information without consent. 740 ILCS § 14/15(d). Karling alleges that Samsara's artificial intelligence dash-cams "use facial recognition technology to capture, collect, store, and use Plaintiff's and Class Members' biometric information—specifically their facial geometry," and that Samsara sells those dash-cams and associated cloud-based software to trucking companies like Karling's employer, who can then access that data. Doc. 1-1, ¶¶ 22–23. Karling has "describe[d] the circumstances of a specific, plausible dissemination," *i.e.*, that Samsara provided the facial scans to Karling's employer. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 618 (N.D. Ill. 2020) (employer provided fingerprint data to software company).

The case on which Samsara relies, *Jacobs*, does not compel another result. There a T.J. Maxx customer sued the manufacturer of a surveillance camera used by the store. The Court

noted that plaintiff did not allege that defendant camera manufacturer "operated the cameras, or in any way accesses or controls T.J. Maxx's security system" or "that defendant operates any systems or servers to store any information captured by the cameras." *Jacobs*, 2021 WL 3172967, at *2. Here, Karling does allege that Samsara operates cameras and software systems that provide his data to his employer. Karling has plausibly alleged a § 15(d) violation.

### e. Intentional or Reckless Violation

Finally, Samsara asks the Court to dismiss the complaint on the basis that Karling does not plead facts to show that Samsara intentionally or recklessly violated the statute or made no effort to comply, and therefore he does not state a claim for enhanced statutory damages. BIPA provides for $5,000 per intentional or reckless violation or $1,000 per negligent violation. 740 ILCS § 14/20(1), (2). Karling argues that BIPA was enacted over a decade ago and Samsara has made no effort to comply. Taking Karling's allegations as true, as the Court must at this stage, Samsara's actions in providing his facial data to his employer without a written release and disclosed retention and destruction policy plausibly alleges at the least a reckless disregard for BIPA. *See Rogers*, 2019 WL 5635180, at *5 ("As Rogers points out, the BIPA took effect more than ten years ago, and if the allegations of his complaint are true—as the Court must assume at this stage—BNSF has made no effort to comply with its requirements. This is certainly enough, at the pleading stage, to make a claim of negligence or recklessness plausible."). Federal notice pleading does not require more. *See id.* ("It is true that Rogers does not plead details regarding what BNSF knew or did not know and when, but Rule 8 does not demand that a plaintiff prove his case at the outset of the litigation." (citation omitted) (internal quotation marks omitted)); *Peatry v. Bimbo Bakeries USA, Inc.*, No. 19 C 2942, 2020 WL 919202, at *6 (N.D. Ill. Feb. 26, 2020) ("Rule 8 does not require a plaintiff to plead damages with particularity and instead only

requires 'a demand for the relief sought.'" (citing Fed. R. Civ. P. 8(a)(3))). The Court will not dismiss Karling's complaint on this basis.

## CONCLUSION

For the foregoing reasons, the Court denies Samsara's motion to dismiss [15].

Dated: July 11, 2022

_____
SARA L. ELLIS
United States District Judge

16